STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| **In re Carson Act 250 JO** | } | **Docket No. 13-1-08 Vtec** |
| **(Appeal of Grimes)** | } | **(Appeal of JO #3-118)** |
| | } | |

## Decision on the Merits

Beverly Grimes ("Appellant") appeals from the determination by the District Coordinator ("Coordinator") of the Act 250 District 3 Environmental Commission ("District Commission") that her neighbors, SallyAnn and Kenneth Carson, need not obtain an amendment to their pre-existing Act 250 state land use permit for the installation of a shed on their abutting residential property. When the parties' negotiations and the Court's ruling on competing motions for summary judgment did not bring about a resolution of the parties' dispute, the Court conducted a site visit and bench trial.

Appellant has been assisted in her presentation to this Court and the District Coordinator by C. Daniel Hershenson, Esq.; attorneys David Grayck and Zachary K. Griefen have assisted Mr. and Mrs. Carson. No other party appeared in the proceedings before this Court.

Based upon the admitted evidence received at trial, including that which was put into context by the site visit the Court conducted with the parties, the Court renders the following Findings of Fact and Conclusions of Law:

## Findings of Fact

I.      General Background and Procedural History

1.      The parties' adjoining properties are located in a twenty-eight lot subdivision known as Plateau Acres in the Town of Bradford. Appellant purchased and moved onto her residential property in 1995; Mr. Carson has been involved in a farming operation on the property that predated its subdivision and development; his involvement dates back to the 1950s.

2.      The land currently owned by the Carsons once consisted of three lots, with a total of 4± acres. There is currently one permanent single family residence on this property.

3.      On March 12, 2007, the District Commission issued an Act 250 Permit, with supporting Findings of Fact and Conclusions of Law, authorizing the reconfiguration of the Carsons' property into two lots, with Lot 1 including the already existing single family residence and Lot

2 proposed for future development. A copy of this Act 250 Permit, #3R0133-4 (hereinafter referred to as the "-4 Permit") was admitted into evidence at trial as Exhibit C.6; a copy of the Findings of Fact, Conclusions of Law, and Order for the -4 Permit ("-4 Findings") was admitted as Exhibit C.5.[1]

4. Paragraphs 14 through 20 of the -4 Findings address aesthetic concerns that the District Commission considered in the 2007 proceedings, including aesthetic concerns raised by Ms. Grimes, Appellant here. As a consequence of those Findings, the District Commission conditioned their subdivision approval by directing that the Carsons mark and maintain a 25-foot buffer along the boundary shared with Appellant. -4 Permit at ¶¶ 11 and 14.

5. Subsequent to the issuance of the 1997 -4 Permit, Appellant Grimes requested that the parties' electric power supplier, Central Vermont Public Service Corporation ("CVPS"), clear some of the trees and other vegetation within the 25-foot buffer on the Carsons' property that was to be maintained as undisturbed pursuant to -4 Permit ¶ 14. The Carsons consented to the CVPS cutting of trees and other vegetation within this buffer area.

6. The Carsons thereafter sought and obtained an amendment to their Act 250 Permit, labeled #3R0133-4A and commonly known as the -4A Permit. A copy of the -4A Permit was admitted into evidence at trial as Exhibit C.12; the underlying Findings of Fact, Conclusions of Law, and Order ("-4A Findings") were admitted as Exhibit C.11.

7. In the -4A Permit proceedings, the Carsons sought to re-establish the 25-foot buffer between their property and that of Appellant. See Exhibit C.11 at 4. The District Commission concluded that due to the CVPS utility line maintenance work requested by Appellant, "the buffer no longer provides an effective screen along the property line." Id.

8. The District Commission directed in the -4A Permit that the Carsons "plant 7 to 9 evergreen trees within the 25-foot setback buffer along the western property line of Lot 2 shared with Ms. Grimes and Mr. Johnson [Ms. Grimes' partner] . . . starting at the top of the upper level of Lot 2, just north of [Ms. Grimes'] shed, for a distance of at least 90 feet south along the [shared] property line. Exhibit C.12 at ¶ 13.

---

[1] A copy of the -4 Permit was also offered by Appellant at trial and admitted as Exhibit 2; a copy of the -4 Findings was admitted as Exhibit 3. This duplication arose because the parties stipulated to accepting into evidence packets of documents that were prepared prior to trial and presented at trial to the other party.

9.      In addition to the planting of these new evergreen trees, the District Commission continued the prohibition against the cutting of trees or other vegetation along the entire 25-foot buffer, which runs along the common boundary line.  Id. at ¶ 14.

10.     A copy of a portion of the Carsons' revised site plan was offered by Appellant at trial and admitted into evidence as Exhibit 4.  Appellant's property is not completely shown on this site map.  The boundary line Appellant shares with Lot 2 of the revised Carson subdivision is shown at the bottom portion of Exhibit 4; the shared boundary line runs in a northerly-southerly direction.

11.     The area on the Carsons' property that includes the 90-foot long, 25-foot wide buffer is sometimes referred to as the "upper plateau," an area located in the southwest corner of Lot 2.  The upper plateau area of Lot 2 is at a similar elevation to Appellant's house lot.  Lot 2 thereafter slopes downward to the east and north.

12.     To the north of the upper plateau area of Lot 2, in an area that is about eleven feet lower in elevation than the upper plateau (and Appellant's property), is a rectangle labeled "Proposed House Site (Approximate)."  The graphic scale on Exhibit 4 suggests that the Proposed House Site area measures about 25' by 35'.[2]

13.     The site plan (Exhibit 4) evidences development that is authorized outside of the Proposed House Site area, including a driveway, water lines, septic tank, leach field, and a reserve area for a replacement leach field.

14.     Pursuant to ¶ 13 of the -4 Permit, the Carsons were directed to "construct the house in the site marked 'proposed house site' on the plans.  The house shall be no higher than 35 feet from the ground as measured from the back [the southerly side, closest to Appellant's property] of the building."  Exhibit C.6 at ¶ 13.

15.     Neither the -4 Permit nor the -4A Permit contain limitations as to where ancillary, non-residential structures may be located on the property.

16.     The Carsons have not yet constructed the house authorized in the -4 Permit.  They have placed a residential trailer at the house site on Lot 2, which they use as their home on a seasonal basis.  The back side of the trailer is closest to Appellant's property line.  The trailer is 13 feet tall; the top portion of it can be seen from Appellant's property.  We therefore deduce that the -4

---

[2]  These measurements are rough approximations, derived from a site plan that has been reduced in size through photocopying.  We also note that the proposed housesite is specifically labeled "Approximate."

Permit authorizes the Carsons to build a permanent home within the proposed house site that is as much as 22 feet taller than the existing trailer on Lot 2.

II.     The Complained-of Shed

17.     Sometime in 2007, the Carsons installed a pre-assembled shed on the upper plateau portion of their Lot 2, outside of the buffer area adjacent to their common boundary line with Appellant. This shed measures 16' by 16' and sits on skids installed on its base, thereby allowing it to be moved. It is located outside of and to the southwest of the 25' by 35' area marked as the proposed house site.

18.     The Carsons use the shed for storage of personal items; it has no electrical, heating, or plumbing fixtures or services; it serves as an ancillary structure to their residence. They intend to continue to use the storage shed after they construct a permanent house on Lot 2.

19.     Appellant also has a separate storage shed on her property, between her house and the boundary line she shares with Lot 2. Appellant's shed is located on the northeast corner of her property; it blocks a small portion, but by no means all of her view to the east.

20.     Appellant's view to the east is obscured—but not completely obstructed—by the trees and vegetation within the 25' buffer area along the Lot 2 western boundary, by the Carsons' storage shed, by the upper portion of the Carsons' trailer, and by Appellant's own shed. The view to the east includes beautiful scenes of hillsides and a partial view of the Connecticut River.

21.     On September 14, 2007, the District Coordinator issued a Project Review Sheet[3] addressing the Carsons' "[c]onstruction of a 16-foot by 16-foot storage shed on the 'upper plateau' of the previously permitted single-family house lot (Lot 2)." The Coordinator concluded that '[a]dding a shed to the previously permitted single-family lot is not a material change to the permit. Act 250 Rule 2(C)(6)." A copy of the single-page project Review Sheet was admitted at trial as Exhibit C.2.

22.     Appellant requested reconsideration of the District Coordinator's September 14, 2007 jurisdictional determination. By way of a four-page letter dated December 18, 2007, the District Coordinator announced that it was her continued opinion that the Carson storage shed did not constitute a material change and therefore did not require an Act 250 permit. It is from that reconsidered determination that Appellant filed a timely appeal with this Court.

---

[3] We understand that a project review sheet is a form often used by Act 250 district coordinators to respond quickly to requests for jurisdictional determinations, such as those contemplated by Act 250 Rule 3, applying the jurisdictional definitions in Act 250 Rule 2(C)(6) and 10 V.S.A. § 6001(3).

## Discussion

Appellant poses seven Questions in this Act 250 appeal, all of which focus our inquiry on the general legal question of whether the Carsons' storage shed constitutes a material or significant change, in light of their pre-existing Act 250 permit and subsequent amendments, so as to require further Act 250 review and approval. For the reasons detailed below, we conclude that the already constructed and installed shed does not require an amendment to the pre-existing permit.

We start with the basic—though not often stated—premise that our state land use regulations, commonly known as Act 250, do not govern all manner of development on Vermont lands. In fact, Act 250 is commonly described as the regulation of major land uses in Vermont; only development significant enough to fit the narrow definition of "development" contained in 10 V.S.A. § 6001(3) is required to obtain an Act 250 permit.

Similarly, not all changes to lands already governed by an Act 250 permit require an amendment to that pre-existing permit. Under Act 250 Rule 34(A), only changes which are "material" trigger the need for a permit amendment.[4] A material change is defined as "any change . . . which has a significant impact on any finding, conclusion, term or condition of the project's permit and which may result in an impact with respect to any of the [Act 250] criteria specified in 10 V.S.A. Section 6086(a)(1) through (a)(10)." Act 250 Rule 2(C)(6). It is within this context that we address the generalized legal question of whether the Carson storage shed triggers an independent obligation to obtain an amendment to their pre-existing Act 250 permits.

We first note that there has been no suggestion in the record before us that the Carson storage shed, in and of itself and without the context of the pre-existing Act 250 permits, constitutes "development" that would independently trigger Act 250 jurisdiction. See 10 V.S.A. § 6001(3)(A). We specifically conclude that it does not. However, since the Carson property is already governed by the -4A Permit and its predecessors, we must determine whether the complained-of shed constitutes a material or substantial impact.

We have previously summarized that an Act 250 permit allows a property owner "to conduct the improvements specifically authorized by the permit, but no more than that." In re

---

[4] By virtue of 10 V.S.A. § 6025(b), the Vermont Legislature conferred the authority upon the Land Use Panel of the Natural Resources Board to "adopt substantive rules, in accordance with the provisions of chapter 25 of Title 3, that interpret and carry out the provisions of this chapter that pertain to land use[s] regulated under section 6086 of this title."

Mountainside Props., Inc., Land Use Permit Amendment, No. 117-6-05 Vtec, slip op. at 9 (Vt. Envtl. Ct. Dec. 13, 2005) (Durkin, J.); accord In re Stowe Club Highlands, 166 Vt. 33, 37 (1996) ("[T]here is no dispute that the applicant is bound by the provisions of the original permit."). Both the former Environmental Board and its successor, the Natural Resources Board, have codified this legal doctrine in the current Act 250 Rule 34, which provides that "[a]n amendment shall be required for any material change to a permitted development or subdivision." Act 250 Rule 34(A). In our quest to determine what constitutes a "material" change, we note again that one requirement of materiality is that the change is one "which has a significant impact on any finding, conclusion, term or condition of the project's permit and which may result in an impact with respect to any of the [Act 250] criteria specified in 10 V.S.A. Section 6086(a)(1) through (a)(10)." Act 250 Rule 2(C)(6) (emphasis added).

Thus, we must first determine what Act 250 criteria, if any, are potentially impacted by the complained-of shed. In her Question 6 (and only in that Question), Appellant questions the shed's impact upon Act 250 Criterion 8, which addresses whether the complained-of shed will "have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8).

The Carsons have argued both during the trial and in their post-trial filings that their shed is so insignificant as to not constitute any change. We reject this argument. Their shed has certainly created a change in the appearance of their property and in the manner in which it may be used. That said, the question before us here is whether the change is a significant change to what was specifically permitted and whether any such change potentially affects Act 250 Criterion 8 relative to what was already permitted. See Act 250 Rules 34(A) and 2(C)(6).

In this regard, to develop the baseline from which any change might be considered material or significant, we must turn to the aesthetic effects of the development that was specifically permitted under the -4 and -4A Permits. In its two most recent reviews of the Carsons' proposed development of their Lot 2, the District Commission concluded that a buffer was warranted between the Carsons' proposed development and Appellant's property. See -4 Permit at ¶ 14 and -4A Permit at ¶ 13. In fact, the Commission was called upon to revisit the Carsons' proposed development when this buffer was partially removed by CVPS, in response to Appellant's request that CVPS maintain its utility easement. From the evidence presented at trial and the language used by the District Commission in its Findings and Permits following both

6

proceedings, we do not find credible Appellant's assertion that the Commission implicitly or explicitly conditioned the Carsons' development of Lot 2 upon either (1) an intention to protect Appellant's view shed or (2) an absolute restriction that all structures, no matter of what significance, only be constructed or installed in the area labeled as "Proposed House Site." Based upon the credible trial evidence and the plain language used by the District Commission in the -4 and -4A Findings and Permits, we conclude that only the proposed house was limited to this 25-foot by 35-foot portion of Lot 2, not any other accessory structures or related development.

We do not dispute the value Appellant currently places upon the view she enjoys to the east, across the Carsons' property, especially of the nearby New Hampshire mountains and a portion of the Connecticut River. But the buffer the District Commission originally directed the Carsons to maintain in the -4 Permit proceedings (and authorized the Carsons to re-establish, after the CVPS cutting, in the -4A Permit proceedings) can only be regarded, in our assessment, as a conclusion by the District Commission that obscuring the view between these two neighbors' properties was the more valued aesthetic concern. Where there is no specific condition requiring the Carsons to maintain Appellant's view shed, we decline to create one now.

Our conclusions here are also supported by the Commission's authorization of the Carsons' construction of a permanent structure at the proposed house site location that could be as tall as the municipal zoning ordinances allowed: 35 feet in height. To allow a house of that height to be built between Appellant's property and her view to the east, in a location where a 13-foot trailer already obscures Appellant's view to some degree, allows us to conclude that the District Commission had aesthetic and other concerns that did not include the view that Appellant now asserts.

In short, the aesthetic baseline created by the -4 and -4A Permits is one of a view obscured by natural vegetation, see -4 Permit at ¶ 14, by "7 to 9 evergreen trees" and any other vegetation "as long as the vegetated buffer is enhanced," -4A Permit at ¶ 13, and by a house that could be up to 35 feet tall. In comparison to this collection of view obstructions, the Carsons' shed is modest in size, including when compared to neighboring houses and even Appellant's own nearby shed. The Carsons' shed is not a residence, has no plumbing, electrical, or heating systems and therefore cannot be used as a residence. We therefore cannot conclude, as Appellant requests, that the District Commission restricted such accessory structures to the 25-

foot by 35-foot portion of Lot 2 identified as the proposed house site.  Nor can we conclude that the Carsons' shed has a potential impact on Act 250 Criterion 8.  Rather, we conclude that, compared to the aesthetic baseline already permitted by the -4 and -4A Permits, the Carsons' shed is not a material change as that term is defined in Act 250 Rule 2(C)(6).  Therefore, no permit amendment is needed.  See Act 250 Rule 34(A).

## Conclusion

For all the reasons more fully discussed above, we conclude that the shed the Carsons installed on the upper plateau of their Lot 2 is not a material change with a potential impact upon Act 250 Criterion 8, which was the only criterion preserved for our review in this appeal.  We therefore conclude that the complained-of shed is not a material change and therefore does not obligate the Carsons to obtain an Act 250 permit amendment.  For these reasons, we **AFFIRM** the original jurisdictional determination announced by the District Coordinator in her Project Review Sheet of September 14, 2007.

This concludes the current proceedings in this appeal before this Court.  A Judgment Order accompanies this Decision.

Done at Ripton, Vermont, this 1st day of June 2009.


_____
Thomas S. Durkin, Environmental Judge

8